UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAVELL FOX,

          Plaintiff,

  -vs-

BERNARD SHEFTIC,

          Defendant.

9:19-CV-00498
(BKS/ATB)

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Defendant contends that, as to the following material facts, no genuine issues exist:

1. Plaintiff, Javell Fox, DIN No. 12-B-1626, is currently an inmate at Great Meadow Correctional Facility. (Pg. 1 of Civil Docket for Case No.: 9:19-CV-00489).

2. After being convicted of Criminal Possession of a Controlled Substance, 3rd Degree, Plaintiff entered state prison in 2012. (Ex. 1 to Arnold Decl., at 11:25-12:14 [Pl.'s Dep. Tr.].)

### Plaintiff's Religious Designations

3. Plaintiff testified at his deposition that he has been an adherent of a religion called Annunaki since 1994. (Ex. 1 to Arnold Decl., at 36:15-18 [Pl.'s Dep. Tr.].)

4. Plaintiff further testified that he began wearing a Mohawk hairstyle after becoming an Annunaki priest sometime in 2013. (*Id.* at 28:10-13; 34:6-19.)

5. During Plaintiff's incarceration, however, he has submitted several different religious designation forms to DOCCS. (Ex. 2 to Arnold Decl.) As of June 14, 2012, Plaintiff had designated himself as an adherent of the Rastafarian faith. (*Id.* at p. 2.)

6. On September 17, 2014, Plaintiff changed his religious designation from Rastafarian to Nation of Islam. (*Id.*)

7. On April 14, 2016, Plaintiff changed his religious designation back to Rastafarian. (*Id.* at p. 3.)

8. On September 11, 2018, Plaintiff changed his religious designation to Santeria from Rastafarian. (*Id.* at p. 4.)

9. In November of 2012, Plaintiff commenced an action in the New York State Court of Claims related to an incident at Elmira Correctional Facility where a corrections official directed Plaintiff to cut his hair. (Ex. 4 to Arnold Decl.)

10. According to Plaintiff's verified complaint in that action, Plaintiff was an active Rastafarian and that it was his "religious belief that [his] hair is connected to the universe as antennas[.]" (*Id.* at p. 3.)

11. Plaintiff filed a request with DOCCS in December of 2014 seeking a permit to grow his beard because he was a member of the Islamic faith, which was subsequently granted. (Ex. 5 to Arnold Decl., at p. 2-6.)

12. In the aforementioned beard permit application, Plaintiff discussed his haircut, stating that "my locks on top and in the back . . . pays reverence to my Native American heritage that I acknowledge through my father's mother who passed away[.] My haircut on the sides and my locks on the top and back constitutes a hairstyle, a hairstyle that is popular amongst minorit[ies] and whites of the punk rock culture." (*Id.* at p. 4-5.)

13. In a letter dated January 13, 2015, addressed to the "Inspector General," Plaintiff complained that "I was ordered to cut my locks because my hair is shaved on the sides, which

represent[s] my Native American heritage, even though I'm registered N.O.I. [Nation of Islam]." (*Id.* at p. 7.)

## **DOCCS Directive No. 4914**

14. DOCCS Directive No. 4914 encompasses the grooming standards applicable to all inmates unless an inmate is specifically covered by a religious or gender identity exemption. (Ex. 8 to Arnold Decl., at ¶ 5 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 6 [Corey Decl.].)

15. Section III(D)(2) of Directive 4914 states that "[o]nly basic haircuts will be allowed. Only one straight part will be allowed, with no other lines, designs, or symbols cut into the hair." (Ex. 13 to Arnold Decl.)

16. Section III(D)(2) of Directive 4914 further defines basic haircuts as (1) short, medium, and long; (2) short, medium, and long pompadour; (3) crew; (4) butch; (5) Quo-vadis (bald); (6) Afro-natural; (7) flat top; and (8) elevation. (*Id.*)

17. Section III(D)(2) of Directive 4914 allows inmates to grow their hair "over the ears to any length desired by the inmate." (*Id.*)

18. Section III(D)(2) of Directive 4914 also permits the cornrow and dreadlock hairstyles so long as these hairstyles are maintained pursuant to the provisions described in this section. (*Id.*)

19. Section III(D)(2) of Directive 4914 states that inmates may only wear one approved hairstyle and no combination of approved hairstyles is allowed. (*Id.*)

20. While DOCCS allows hair and shaving accommodations for inmates exercising a religious right, DOCCS does not permit designer styles. (Ex. 8 to Arnold Decl., at ¶ 11 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 10 [Corey Decl.].)

21. DOCCS considers a Mohawk hair style to be a designer style, which is strictly prohibited by Directive 4914. (Ex. 8 to Arnold Decl., at ¶ 5 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 10 [Corey Decl.].)

**DOCCS Directive 4914 Serves a Legitimate Penological Purpose**

22. By placing limits on the hairstyles and designs that inmates may wear, DOCCS is better able to identify inmates. (Ex. 8 to Arnold Decl., at ¶ 7 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 8 [Corey Decl.].)

23. Hairstyles may pose unique safety and security concerns within a correctional facility. For example, hairstyles can be used as status symbols, identification with a gang or prohibited organization, or to demonstrate a particular hierarchy within a group. (Ex. 8 to Arnold Decl., at ¶ 6 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 7 [Corey Decl.].)

24. Hairstyles can also be used to hide or transport contraband, including, but not limited to, drugs, weapons and unauthorized communications. (Ex. 8 to Arnold Decl., at ¶ 8 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶ 9 [Corey Decl.].)

25. Plaintiff's disciplinary history has occasions where drug possession and smuggling have occurred. (Ex. 9 to Arnold Decl., at ¶ 14 [Corey Decl.].)

26. Part of the frisking procedure requires an inmate to run their fingers through their hair. Any hairstyle which creates pockets, cavities or an area where an object could be hidden becomes a security concern and further hinders the frisking process. (*Id.* at ¶ 12.)

27. Haircuts such as dreadlocks, ponytails, or curls on the side of the head that are typically worn by Jewish inmates, do not pose a significant security risk when these hairstyles are worn in compliance with the provisions of Directive 4914. (*Id.* at ¶ 13.)

28. These haircut styles are clearly defined in Directive 4914 and the searching of these types of haircuts is addressed in Directive 4910, Control of & Search for Contraband. (*Id.*) This is in contrast to a designer hairstyle such as a Mohawk. (*Id.*)

**Plaintiff's Encounters with Corrections Officials at Auburn Related to His Hairstyle**

29. Plaintiff was transferred from Green Haven Correctional Facility to Auburn Correctional Facility on August 16, 2018. (Ex. 2 to Arnold Decl. at p. 5 [internal movement history].)

30. Plaintiff testified at his deposition that his Mohawk haircut was approximately eight inches in length on the top of his head while he was housed at Auburn. (Ex. 1 to Arnold Decl., 19:9-19 [Pl.'s Dep. Tr.].)

31. Defendant encountered Plaintiff soon after he arrived at Auburn C.F. from Green Haven C.F. (Ex. 6 to Arnold Decl., at ¶ 3 [Sheftic Decl.].)

32. During this encounter, Defendant observed that Plaintiff had a Mohawk hairstyle. (*Id.* at ¶ 4.)

33. Defendant informed Plaintiff that he would need to change his hairstyle and bring it into compliance with DOCCS' Directive No. 4914, which governs inmate grooming standards. (*Id.*)

34. Defendant did not threaten Plaintiff with disciplinary action if he did not comply with his request. (*Id.*)

35. Plaintiff did not show Defendant a copy of a court order that permitted him to have a Mohawk hairstyle or any other legal document. (*Id.* at ¶ 5.)

36. At no time did Plaintiff inform Defendant that his hairstyle was religious in nature or that he was an adherent of a religion called Annunaki. (*Id.* at ¶ 6.)

37. Sometime in late August 2018, after Plaintiff's encounter with Defendant, Corrections Officer Richard Plueger observed Plaintiff with a Mohawk hairstyle in the C-Block area of Auburn C.F. (Ex. 7 to Arnold Decl., at ¶ 4 [Plueger Decl.].)

38. Officer Plueger approached Plaintiff and warned him that his hairstyle was not in compliance with Directive No. 4914 and that he needed to change his hairstyle. (*Id.*)

39. Plaintiff responded to Officer Plueger that he had a court order permitting him to have his hairstyle. (*Id.* at ¶ 5.)

40. However, Plaintiff could not produce the court order when Officer Plueger requested to inspect a copy. (*Id.*)

41. After this encounter with Plaintiff, Officer Plueger attempted to independently investigate whether Plaintiff did in fact have a court order permitting him to wear a Mohawk hairstyle but Officer Plueger's research did not produce anything that supported Plaintiff's claim. (*Id.*)

42. On the morning of August 29, 2018, Officer Plueger once again observed Plaintiff with a Mohawk hairstyle while he was on his way to the mess hall. (*Id.* at ¶ 6.)

43. Officer Plueger once again approached Plaintiff regarding his hairstyle and Plaintiff responded that he was not going to get a haircut. (*Id.*)

44. During this encounter, Plaintiff once again could not produce a copy of the court order that he claimed allowed him to maintain his hairstyle. (*Id.*)

45. As a result of Plaintiff's refusal to bring his hair into compliance with Directive 4914, Officer Plueger issued Plaintiff a misbehavior report dated August 29, 2018. (*Id.* at ¶ 7.)

46. Officer Plueger also placed Plaintiff in keeplock on the same date. (*Id.* at ¶ 8.)

47. Plaintiff was released from keeplock after spending 3 days in keeplock confinement. (Ex. 1 to Arnold Decl., at 47:5-7 [Pl.'s Dep. Tr.].)

48. At no time did Officer Plueger discuss this matter with Defendant, nor did Defendant direct Officer Plueger to take disciplinary action against Plaintiff. (Ex. 7 to Arnold Decl., at ¶ 8 [Plueger Decl.].)

49. At no time did Plaintiff inform Officer Plueger that his hairstyle was religious in nature. (*Id.* at ¶ 9.)

50. At no time did Plaintiff inform Officer Plueger that he was an adherent of a religion called Annunaki. (*Id.*)

51. On May 1, 2020, Officer Plueger observed inmate Ariel Myers with a hairstyle not in compliance with Directive No. 4914 while he was on his way to the mess hall from the B-Block area of Auburn C.F. (*Id.* at ¶ 10.)

52. Inmate Myers had shaved the sides and back of his head and had a braid on the top of his head in a "Top Knot" fashion. (*Id.*)

53. Officer Plueger had previously counseled inmate Myers to bring his hairstyle into compliance with Directive No. 4914 and gave him approximately one week to do so. (*Id.* at ¶ 11.)

54. However, inmate Myers continued to maintain his improper hairstyle and, on May 1, 2020, Officer Plueger issued inmate Myers a misbehavior report for his refusal to change his hair. (*Id.* at ¶ 12.)

55. Inmate Myers is now in compliance with Directive No. 4914. (*Id.*)

## The Inmate Grievance Program at Auburn in 2018

56. In August of 2018, Auburn C.F. had a fully functioning inmate grievance process available and inmates at Auburn had full access to the CORC by which to appeal from facility-level grievance determinations. (Ex. 10 to Arnold Decl., at ¶ 11 [Seguin Decl.].)

57. The inmate grievance program has three steps. N.Y.C.R.R. tit. 7, § 701.5 (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

58. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. N.Y.C.R.R. tit. 7, § 701.5(a)(1) (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

59. An IGP representative has sixteen calendar days to informally resolve the issue. N.Y.C.R.R. tit. 7, § 701.5(b)(1) (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

60. If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. N.Y.C.R.R. tit. 7, §§ 701.5(b)(2)(i)-(ii) (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

61. If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. N.Y.C.R.R. tit. 7, § 701.5(c)(1) (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

62. If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. N.Y.C.R.R. tit. 7, §§ 701.5(d)(i)-(ii) (2015); (Ex. 10 to Arnold Decl., at ¶ 5 [Seguin Decl.].)

63. CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." N.Y.C.R.R. tit. 7, § 701.5(d)(3)(ii) (2015).

### Plaintiff's Grievance No. AUB-74864-18

64. Plaintiff filed a grievance dated August 27, 2018, while at Auburn C.F. regarding alleged harassment by unnamed corrections officials related to his Mohawk hairstyle. (Ex. A to Parmiter Decl., at p. 3.)

65. In his grievance, Plaintiff stated that he had a court order permitting him to have a Mohawk hairstyle, which he claimed is a symbol of the Annunaki religion and requested that officers "leave [him] alone" and to "stop this race bashing and culture bashing." (*Id.*)

66. Plaintiff's grievance makes no mention of having been placed in keeplock confinement, or that he was retaliated against for any reason, let alone for having filed a prior federal lawsuit. (*Id.*)

67. Similarly, Plaintiff's grievance makes no mention of having been treated differently from other inmates and/or religious groups on account of his religion or race. (*Id.*)

68. Complaints regarding retaliation and/or disparate treatment based on religion and/or race are proper subjects for a grievance under DOCCS' grievance procedures. (Ex. 10 to Arnold Decl., at ¶ 9 [Seguin Decl.].)

69. On September 20, 2018, the IGRC issued a response to Plaintiff regarding his grievance. (Ex. A to Parmiter Decl., at p. 2.) The response reminded Plaintiff that corrections officers follow Directive 4914 "in order to effectively do their jobs." (*Id.*) The response further advised Plaintiff to keep a copy of his court order on his person at all times and to show it to

9

corrections staff whenever questioned about his hairstyle. (*Id.*) Accordingly, Plaintiff's grievance was "granted to that extent." (*Id.*)

70. Plaintiff testified at his deposition that he was satisfied with the IGRC's response. (Ex. 1 to Arnold Decl., at 82:3-5 [Pl.'s Dep. Tr.].)

71. Plaintiff further testified that he did not appeal the IGRC response and that there were no outstanding issues that he was concerned about that were not addressed by the IGRC. (*Id.* at 82:12-19; Ex. 11 to Arnold Decl., at ¶¶ 8, 10 [Parmiter Decl.].)

72. Plaintiff did not file any other grievances related to the alleged incidents in late August of 2018 at Auburn C.F. (Ex. 11 to Arnold Decl., at ¶¶ 5-10 [Parmiter Decl.].)

### **Conditions of Plaintiff's Keeplock Confinement**

73. During Plaintiff's three day keep-lock confinement, Plaintiff testified at his deposition that he had the option to participate in recreation but he refused to because it required him to "stand in a cage" in the recreation yard. (Ex. 1 to Arnold Decl., at 47:8-25 [Pl.'s Dep. Tr.].)

74. Plaintiff further testified that, in order to participate in recreation, he had to put his shoes on the food slot of his cell so they could be searched before being allowed out to the recreation yard. (*Id.* at 47:17-25.) Plaintiff refused to do this because he felt it was degrading and therefore chose not to participate in recreation. (*Id.*)

75. Plaintiff filed a grievance (AUB-74862-18) dated August 27, 2018, complaining about the requirement that he take his shoes off, place them on his feed-up slot, and walk on "dirty floors" before being allowed to attend recreation. (Ex. B to Parmiter Decl., at p. 7 [Grievance AUB-74862-18].) Plaintiff testified that he would have to stand outside of his cell without shoes for "[m]aybe a minute." (Ex. 1 to Arnold Decl., at 49:19-22 [Pl.'s Dep. Tr.].)

76. The IGRC responded to Plaintiff's grievance, noting that "[p]rocedure for keeplock frisk of inmates for recreation or otherwise is that of the choice of the inmate to wear shower shoes or not during the frisk. Footwear that is frisked is placed either on the bars or floor. It is the inmates[sic] responsibility to maintain cell standards and cleanliness." (Ex. B to Parmiter Decl., at p. 5.)

77. Plaintiff was provided meals while he was in keep-lock confinement but he chose not to consume those meals because they contained meat. (Ex. 1 to Arnold Decl., at 48:5-16 [Pl.'s Dep. Tr.].)

78. Plaintiff further testified that there was nothing preventing him from sending mail to family members while in keep-lock confinement but, due to an encumbrance on his inmate account, he did not have sufficient funds for stamps. (*Id.* at 88:3-89:20.)

79. Plaintiff testified that he did not see Defendant at all while he was in keep-lock confinement. (*Id.* at 50:8-10.)

Dated: August 13, 2019
      Syracuse, New York

                LETITIA JAMES
                Attorney General of the State of New York
                Attorney for Defendants

                */s/ William E. Arnold, IV*
                By:  William E. Arnold, IV
                      Assistant Attorney General
                      Bar Roll No. 519178
                      300 So. State St., Suite 300
                      Syracuse, New York 13202
                      Telephone: (315) 448-4800