UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAVELL FOX,

                       Plaintiff,

     -vs-

BERNARD SHEFTIC,

                       Defendant.

9:19-CV-00498
(BKS/ATB)

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

LETITIA JAMES
*Attorney General of the State of New York*
Attorney for Defendant

WILLIAM E. ARNOLD, IV
*Assistant Attorney General, Of Counsel*
Bar Roll No. 519178
300 So. State St., Suite 300
Syracuse, New York 13202
Telephone: (315) 448-4800
Fax: (315) 448-4853

Date:  August 17, 2020

# TABLE OF CONTENTS

RELEVANT LEGAL STANDARD ............................................................................. 1

ANALYSIS ........................................................................................................... 2

POINT I

PLAINTIFF'S MOTION FAILS TO COMPLY WITH N.D.N.Y. L.R. 7.1(A) AND 7.1(A) (3) AND
THEREFORE MUST BE DENIED ............................................................................. 2

POINT II

PLAINTIFF HAS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES WITH RESPECT TO HIS
FIRST AMENDMENT RETALIATION AND EQUAL PROTECTION CLAIMS AS REQUIRED BY THE
PRISON LITIGATION REFORM ACT ....................................................................... 4

    A.  Plaintiff's First Amendment Retaliation Claim Has Not Been Properly Exhausted .......... 6

    B.  Plaintiff's Fourteenth Amendment Equal Protection Claim Has Not Been Properly
      Exhausted ................................................................................................. 8

POINT III

DEFENDANT WAS NOT PERSONALLY INVOLVED IN THE ALLEGED UNDERLYING EVENTS OF
THIS ACTION ..................................................................................................... 10

POINT IV

PLAINTIFF'S FIRST AMENDMENT RELIGIOUS CLAIMS MUST BE DISMISSED .................. 11

    A.  Sincerely Held Belief .................................................................................. 12

    B.  Substantial Burden ..................................................................................... 15

    C.  Legitimate Penological Purpose ................................................................... 17

POINT V

PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS MUST BE DISMISSED .............. 18

POINT VI

Plaintiff's Fourteenth Amendment Equal Protection Claims Must Be Dismissed ....... 23

POINT VII

Defendant Is Entitled to Qualified Immunity...................................................................... 27

CONCLUSION................................................................................................................................ 30

**RELEVANT LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 [2d Cir. 1985]). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 [2d Cir. 1995]).

## ANALYSIS

### POINT I

#### PLAINTIFF'S MOTION FAILS TO COMPLY WITH N.D.N.Y. L.R. 7.1(A) AND 7.1(A) (3) AND THEREFORE MUST BE DENIED

Rule 7.1(a) of the Local Rules of Practice requires a movant to file a "memorandum of law, supporting affidavit, and proof of service on all parties." N.D.N.Y. L.R. 7.1(a). With respect to summary judgment motions, the movant is required to file a Statement of Material Facts, which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue" with specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3); *see Youngblood v. Glasser*, No. 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012)[1] (Peebles, M.J.) (noting that the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment."); *N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district

---

[1] Hardcopies of all unpublished court decisions cited in this Memorandum of Law have been provided to Plaintiff.

courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'''). Importantly, "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in denial of the motion." *Id.* (emphasis in original).

Here, in support of his motion for summary judgment, Plaintiff has only served and filed a memorandum of law (Dkt. No. 29). Plaintiff has not filed a supporting affidavit, as required by L.R. 7.1(a), and, more importantly, he has not filed a Statement of Material Facts. The latter omission makes it impossible for Defendant to refute any facts asserted in Plaintiff's motion. Although Plaintiff's Memorandum of Law contains a "Preliminary Statement," the paragraphs included in that Statement are unnumbered, contain numerous conclusory and legal assertions with minimal factual detail, and are devoid of record citations.

Despite the Local Rule's statement that the failure to file a proper Statement of Material Facts "*shall* result in denial of the motion[,]" the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of, and response to, statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

It is respectfully submitted that the Court should not overlook Plaintiff's failure to comply with Rules 7.1(a) and 7.1(a)(3). More specifically, this is not the first time Plaintiff has run afoul of these specific Local Rules. In *Fox v. Lee*, Plaintiff filed a summary judgment motion without a separate Statement of Material Facts. *Fox v. Lee*, No. 9:15-CV-0390, 2018 WL 1211111, at *8 (N.D.N.Y. Feb. 5, 2018). United States Magistrate Judge Hummel excused Plaintiff's failure to

comply with Rule 7.1(a)(3), stating that, "[o]ut of extreme solicitude to plaintiff's *pro se* status, the Court accepts for filing plaintiff's enlarged . . . Memorandum of Law for filing that contains his statement of material facts within." *Id.*   Importantly, in *Fox v. Lee*, and unlike in this case, Plaintiff included 147 numbered paragraphs of factual assertions (without record citations) within his memorandum of law.   *Fox v. Lee*, 9:15-CV-0390, at Dkt. No. 111, Attach. 1.   Despite being counseled regarding Rule 7.1(a)(3) and given "extreme solicitude" by Judge Hummel after failing to comply with this Rule, Plaintiff has not only once again failed to comply with this Rule but has not bothered to include a fact section with numbered paragraphs in his current motion as he did in *Fox v. Lee*.   For these reasons, Plaintiff should not be accorded special solicitude and his motion must be denied on this basis alone.   *See Edwards v. New Opportunities, Inc.*, No. 05-CV-1238, 2008 WL 11489009, at *2 (D. Conn. July 1, 2008) (declining to accord *pro se* plaintiff special solicitude after plaintiff failed to properly respond to defendant's statement of material facts where plaintiff had been previously warned about the need to comply with the local rule regarding summary judgment motions).

## POINT II

### PLAINTIFF HAS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES WITH RESPECT TO HIS FIRST AMENDMENT RETALIATION AND EQUAL PROTECTION CLAIMS AS REQUIRED BY THE PRISON LITIGATION REFORM ACT

Plaintiff's Fourteenth and First Amendment retaliation claims must be dismissed because Plaintiff failed to exhaust his administrative remedies through available grievance procedures before commencing the present action.   The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires a prisoner to exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.   *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo*, 548 U.S. 81, 82 (2006).   The exhaustion requirement

4

applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  *Id.* at 524.  To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation omitted).  If it is found that the plaintiff has not exhausted all available administrative remedies, his or her case generally should be dismissed without prejudice.  *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted).

Here, Plaintiff testified at his deposition that he was very familiar with the DOCCS' grievance process and he had filed approximately 70 grievances in the past.  (Ex. 1 to Arnold Decl., at 78:14-79:4 [Pl.'s Dep. Tr.].)  Plaintiff further testified that he filed a grievance related to the underlying incident with Defendant that occurred in late August of 2018 at Auburn Correctional Facility.  (Ex. 1 to Arnold Decl. at 79:11-81:13 [Pl.'s Dep. Tr.]; Ex. A to Parmiter Decl. [Pl.'s Grievance].)  Plaintiff's grievance essentially stated that he was being harassed by corrections officers about his Mohawk hairstyle that he is permitted to have pursuant to a federal court order. (Ex. 1 to Arnold Decl. at 79:22-81:13 [Pl.'s Dep. Tr.].)  Plaintiff requested that officers be directed to "leave [him] alone about [his] hair[.]" (*Id.* at 81:6-7.)  Thereafter, Plaintiff received a response from the IGRC on or about September 20, 2018, stating that "Officers utilize [Directive 4914] and others in order to effectively do their jobs.  It is recommended that grievant carries a copy of the Federal Court Order on his person and show it to staff whenever questioned.  Grievant's religious practice should not be in question whenever grievant chooses to leave his cell.  Grievance is

granted to that extent." (Ex. A to Parmiter Decl. at p. 2 [IGRC Response].) Importantly, Plaintiff testified that he (a) was satisfied with this response, (b) did not appeal it, and (c) there were no outstanding issues that he was concerned about that were not addressed by the response from the IGRC. (Ex. 1 to Arnold Decl. at 82:3-11 [Pl.'s Dep. Tr.].) Although Plaintiff testified that he filed a separate grievance related to the conditions of his keep-lock (Ex. B to Parmiter Decl., at p. 7 [Grievance AUB-74862-18]), he did not file any other grievances regarding the underlying incident involving Defendant. (Ex. 1 to Arnold Decl. at 82:12-19 [Pl.'s Dep. Tr.].)

A.    **Plaintiff's First Amendment Retaliation Claim Has Not Been Properly Exhausted**

In order to properly exhaust his claims, Plaintiff was required to provide "a specific description of the problem" in his grievance. *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009). While a plaintiff is not required to identify the person responsible for the alleged misconduct, he has to "provide enough information about the conduct . . . to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004); *see Espinal*, 558 F.3d at 127. In determining whether exhaustion has been achieved, the Second Circuit has "drawn an analogy between the contents of an administrative grievance and notice pleading, explaining that 'as in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.'" *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Strong v. David*, 297 F.3d 646, 650 [7th Cir. 2002]) (internal marks and quotations omitted). However, while "a liberal grievance pleading standard" applies to *pro se* inmates, "the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell*, 446 F.3d at 310.

In *Gonzalez v. Coburn*, an inmate plaintiff filed a grievance alleging that officers assaulted him while he was being searched for contraband and was subsequently placed in contraband watch for 65 days. *Gonzalez v. Coburn*, No. 16-CV-06174, 2017 WL 6512859, at *1 (W.D.N.Y. Dec. 20, 2017). As part of his grievance, the plaintiff requested that the abuse cease and that he be compensated for the time he spent in contraband watch. *Id.* The plaintiff then commenced a federal civil rights action asserting, *inter alia*, a First Amendment retaliation claim, alleging that he was placed in contraband watch for retaliatory reasons. The court held that the plaintiff failed to properly exhaust this claim, noting that the grievance failed to "allege any facts suggesting [defendants] subjected him to excessive force and confinement on special contraband watch for retaliatory reasons." *Id.* at *6. The court further noted that plaintiff's grievance sought only for "the abuse to stop" and compensation for his placement on contraband watch. *Id.*; *cf. Varela v. Demmon*, 491 F. Supp. 2d 442, 448 (S.D.N.Y. 2007) (inmate exhausted retaliation claim where, although grievance did not use the word "retaliation," "fairly read, it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors" since it stated that "Demmon said, on the day before the assault: 'Since you like to cry to my superiors, I'm going to show you who the real boss around here is. Your time will come soon.'"); *Nunez v. Donahue*, No. 12-CV-1071, 2016 WL 29616, at *4 (N.D.N.Y. Jan. 4, 2016) (Sannes, J.) (holding that "plaintiff's grievance was sufficient to exhaust his retaliation claim against defendant Weeks because it was sufficient to alert prison officials to his claim of retaliatory keep lock. The grievance described the specific dates and location of the incident, and plaintiff sought damages for having been in keep lock. Although plaintiff did not allege that his keep lock was retaliatory, the facts alleged in the grievance, when fairly read, suggest that the keep lock was retaliatory.").

Here, Plaintiff's grievance merely alleges that he was being harassed by "corrections officials" because of his hairstyle.  Unlike in *Nunez*, *supra*, the grievance does not mention that Plaintiff was placed in keep-lock, nor does it allege any facts suggesting that he was retaliated against for filing a prior lawsuit regarding his hairstyle.  Further, as in *Gonzalez*, Plaintiff's grievance simply requests that officers "leave me alone" and does not seek compensation for being placed in keep-lock due to retaliation.  Despite retaliation by corrections staff being a proper subject for a grievance, Plaintiff did not pursue any additional recourse to have this issue considered.  (Ex. 10 to Arnold Decl., at ¶¶ 9, 12 [Seguin Decl.]; Ex. 11 to Arnold Decl., at ¶¶ 5-10 [Parmiter Decl.].)  In fact, Plaintiff testified that he was satisfied with the IGRC response and that there were no outstanding issues (such as alleged retaliation) that he was concerned about that were not addressed by the IGRC.  Finally, Plaintiff testified that he did not file any additional grievances in relation to the underlying incident involving Defendant.  (Ex. 1 to Arnold Decl. at 82:12-19 [Pl.'s Dep. Tr.]; Ex. 10 to Arnold Decl., at ¶ 12 [Seguin Decl.]; Ex. 11 to Arnold Decl., at ¶¶ 5-10 [Parmiter Decl.].)  For the foregoing reasons, it is respectfully submitted that Plaintiff's First Amendment retaliation claim should be dismissed.

**B.    Plaintiff's Fourteenth Amendment Equal Protection Claim Has Not Been Properly Exhausted**

As is the case with Plaintiff's First Amendment retaliation claim, it is respectfully submitted that Plaintiff has also failed to properly exhaust his equal protection claim.  Specifically, although Plaintiff's grievance states that the Mohawk hairstyle is a symbol of Plaintiff's religion, the grievance did not provide notice that Plaintiff was being unlawfully discriminated against as compared to other religious groups recognized by DOCCS or similarly situated inmates.  Despite being a proper subject for a grievance, Plaintiff did not file a separate grievance related to unequal treatment based on his religion and/or race.  (Ex. 10 to Arnold Decl., at ¶¶ 9, 12 [Seguin Decl.];

8

Ex. 11 to Arnold Decl., at ¶¶ 5-10 [Parmiter Decl.].)  *See Young v. Goord*, No. 01-CV-0626, 2002

WL 31102670, at *4 (E.D.N.Y. Sept. 3, 2002) (holding that inmate plaintiff who was disciplined

for refusing to trim his beard failed to exhaust equal protection claim because, "[a]t no point during

the administrative proceedings did plaintiff raise, in words or substance, an equal protection claim

based on the differential treatment of other Rastafarians."), *aff'd in relevant part by Young v.*

*Goord*, 67 F. App'x 638, 641 (2d Cir. 2003) ("With respect to Young's equal protection claim, we

affirm the District Court's dismissal of this claim for the reasons stated in its opinion."); *Richard*

*v. LeClaire*, No. 9:15-CV-00006, 2019 WL 5197041, at *7-8 (N.D.N.Y. May 6, 2019) (Dancks,

M.J.) (finding that plaintiff failed to exhaust equal protection claim because he never filed a

grievance regarding his allegation that prison officials singled him out for designs shaved into his

beard, while prison officials "totally ignored white inmates who wore biker style beards or ZZ Top

very long beards that violated Directive 4914[.]"); *Ordonez v. Beatty*, No. 9:15-CV-1198, 2017

WL 4325780, at *5 (N.D.N.Y. Aug. 22, 2017) (Peebles, M.J.) (finding that plaintiff failed to

exhaust equal protection claim where "neither of the grievances cited referenced racial

discrimination, nor did they suggest race as a possible motivation for permitting plaintiff to live in

the unhygienic conditions of confinement as alleged.  Because plaintiff's grievances do not make

allegations of, or otherwise reference, discrimination based on plaintiff's race or ethnicity, DOCCS

officials have never had an opportunity to investigate and address that allegation, and plaintiff has

failed to exhaust his available administrative remedies with respect to his race discrimination and

equal protection claims."); *McGee v. Haigh*, No. 13-CV-394, 2015 WL 1456612, at *14 (N.D.N.Y.

Mar. 30, 2015) (Peebles, M.J.) (finding plaintiff failed to exhaust his equal protection claim based

on the denial of meals, showers, and commissary due to plaintiff's sexual orientation because,

although plaintiff grieved the denial of these rights/privileges, none of the grievances included an allegation of discrimination).

## POINT III

### DEFENDANT WAS NOT PERSONALLY INVOLVED IN THE ALLEGED UNDERLYING EVENTS OF THIS ACTION

It is well established that, in order to recover money damages under § 1983, a plaintiff must show that the defendant was personally involved in the constitutional violations. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates.  *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1995).

Here, Plaintiff has maintained that he was approached by Defendant regarding his Mohawk hairstyle and that Defendant eventually placed him in keeplock for refusing to cut his hair.  (Ex. 1 to Arnold Decl., at 39:18-44:22 [Pl.'s Dep. Tr.]; Dkt. No. 16, at ¶¶ 1-4, 6 [Am. Compl.].)  However, according to Defendant, he had only one encounter with Plaintiff about his hairstyle soon after Plaintiff transferred to Auburn C.F. from another facility.  (Ex. 6 to Arnold Decl., at ¶¶ 3, 7 [Def.'s Decl.].)  At this time, Defendant took note of Plaintiff's unusual hairstyle and informed Plaintiff that he would have to bring his hairstyle into compliance with Directive 4914.  (*Id.* at ¶ 4.)  According to Defendant, Plaintiff did not show him a court order that allowed Plaintiff to maintain his Mohawk hairstyle and Defendant did not interact with Plaintiff after this initial encounter.  (*Id.* at ¶¶ 5, 7.)  This is consistent with the declaration filed by Defendant[2] in Plaintiff's companion action, *Fox v. Lee*, 9:15-CV-390 (TJM/CFH).

Rather, according to Corrections Officer Richard Plueger, Pflueger issued Plaintiff a misbehavior report on August 29, 2018, because, after giving Plaintiff a previous warning, Plaintiff

---

[2]    *See* Dkt. No. 203, Attach. 1 in *Fox v. Lee*, 9:15-CV-390 (filed 9/19/2018).

was wearing a Mohawk hairstyle, which was not in compliance with Directive 4914.  (Ex. 7 to Arnold Decl., at ¶¶ 4, 6-7 [Plueger Decl.].)  According to the misbehavior report, Officer Plueger had previously ordered Plaintiff to come into compliance with Directive 4914 but Plaintiff refused.  (Ex. A to Plueger Decl. [Misbehavior Report 8/29/18].)  The report further states that, although Plaintiff claimed to have a court order allowing him to have his hairstyle, he could not produce the court order upon request and, after further investigation, Officer Plueger could not verify that a court order existed.  (*Id.*)  The keeplock logbook from August 29, 2018, establishes that Officer Plueger, and not Defendant, placed Plaintiff into keeplock.  (Ex. 12 to Arnold Decl.)

Based upon the foregoing, it is respectfully submitted that the claims against Defendant must be dismissed because the objective record evidence establishes that Defendant was not personally involved in the alleged events that give rise to this action.

## POINT IV

### PLAINTIFF'S FIRST AMENDMENT RELIGIOUS CLAIMS MUST BE DISMISSED

Plaintiff alleges in his Amended Complaint that he was punished by Defendant for refusing a direct order to cut his Mohawk hairstyle, which he alleges is a "sincerely held religious symbol." (Dkt. No. 16, at ¶ 4 [Am. Compl.].)  The Court previously held that Plaintiff's allegations related to his First Amendment religious claims were sufficient to survive the Court's initial review.[3] (Dkt. No. 19, at 4-5 [Decision & Order filed 1/24/20].)

---

[3]       In its Decision and Order dated January 14, 2020, the Court found that Plaintiff had sufficiently alleged "First Amendment religious claims." (Dkt. No. 19 at 8).  The Court also noted that the Amended Complaint did not re-assert a previously dismissed First Amendment freedom of speech/expression claim. (*Id.* at p. 4, n.1).  Based upon this language, Defendant presumes that, in addition to Plaintiff's First Amendment retaliation claim, only a single First Amendment Free Exercise claim is currently pending. Nonetheless, if Defendant is mistaken based on the Court's reference to "First Amendment religious claims" (plural) and a First Amendment freedom of expression claim is still pending, then that claim will be analyzed with Plaintiff's free exercise claim. *See Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, at *12 n.28 (N.D.N.Y. Feb. 5, 2018) ("Plaintiff's freedom of expression claim is 'cognizable under the First Amendment's Free Exercise Clause.' Therefore, plaintiff's freedom of expression claim will

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). This protection extends into aspects of prison life including, for example, that of an inmate's diet. *Ford*, 352 F.3d at 597. However, this right is not absolute or unbridled, and, even if a regulation "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

Given this balance, "[e]xamination of [a prisoner's] free exercise claim entails application of a three-part, burden shifting framework." *Johnson v. Guiffere*, No. 04-CV-0057, 2007 WL 3046703, at *5 (N.D.N.Y. Oct. 17, 2007) (Peebles, M.J.). The prisoner must establish (1) that he or she has a sincerely held religious belief, and (2) that this religious belief was substantially burdened. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). Once a prisoner has made this showing, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. After the defendants articulate such a justification, the prisoner must establish that "the policy is not reasonably related to legitimate penological interests." *Guiffere*, 2007 WL 3046703, at *6; *Salahuddin*, 467 F.3d at 274.

## A.    Sincerely Held Belief

Scrutiny regarding a prisoner's religious beliefs "extends only to whether a [prisoner] sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590 (quoting *Jolly v. Coughlin*, 76 F.3d 468, 476 [2d Cir. 1996]). "[T]he relevant inquiry is not

---

be discussed in conjunction with his free exercise claim.") (quoting *Shepherd v. Fisher*, No. 08-CV-9297, 2017 WL 666213, at *31 [S.D.N.Y. Feb. 16, 2017]).

whether, as an objective matter, the belief is accurate or logical . . . [but] . . . whether the beliefs . . . are sincerely held and whether they are, in [the prisoner's] own scheme of things, religious." *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (emphasis, citation, internal quotation marks omitted). The test is subjective because an objective test "would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be." *Jolly*, 76 F.3d at 476. In particular, "[t]he opinions of . . . religious authorities cannot trump the [prisoner's] sincere and religious belief." *Ford*, 352 F.3d at 590. On the other hand, scrutinizing a "prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Id.* at 588 (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 [2d Cir. 1984]). "While it is a delicate task to evaluate religious sincerity without questioning religious verity, [the] free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions." *Id.* (emphasis omitted in original) (quoting *Jolly*, 76 F.3d at 476).

In the present case, Plaintiff testified at his deposition that he has been an adherent of Annunaki since 1994. (Ex. 1 to Arnold Decl., at 36:15-18 [Pl.'s Dep. Tr.].) However, as of June 14, 2012, Plaintiff had designated himself as an adherent of the Rastafarian faith with DOCCS. (Ex. 2 to Arnold Decl., at p. 2.) Thereafter, on September 17, 2014, Plaintiff changed his religious designation to Nation of Islam. (*Id.*) Plaintiff then switched back to the Rastafarian faith on April 14, 2016. (*Id.* at p. 3.) Finally, Plaintiff designated himself as an adherent of the Santeria faith on September 11, 2018. (*Id.* at p. 4.) When questioned about these various religious designations at his deposition, Plaintiff testified that "Annunaki practices all of these religions because all of those religions come from Annunaki." (Ex. 1 to Arnold Decl., at 27:12-14 [Pl.'s Dep. Tr.].) Notably,

in November of 2012, Plaintiff filed an action in the New York State Court of Claims related to an incident where a corrections official at Elmira Correctional Facility directed Plaintiff to cut his hair.  (Ex. 4 to Arnold Decl.)  According to Plaintiff's verified pleading in that action, Plaintiff was "an active Rastafarian" and that it was his "religious belief that [his] hair is connected to the universe as antennas[.]"[4] (*Id.* at p. 3.)

Despite commencing a lawsuit based on his alleged Rastafarian faith, Plaintiff testified at his deposition that he began wearing a Mohawk hairstyle sometime in 2013 (while the aforementioned lawsuit was still pending) after becoming an Annunaki priest.  (Ex. 1 to Arnold Decl., at 28:10-13; 34:6-19 [Pl.'s Dep. Tr.].)  When asked whether he can wear a hairstyle other than a Mohawk, Plaintiff responded that he had "never seen any priest that wore anything other than a Mohawk" (*id.* at 36:23-24) despite acknowledging that he had only ever met one other Annunaki priest (*id.* at 37:4-7).  Notwithstanding Plaintiff's claim that he became an Annunaki priest in 2013, and his claim in the Court of Claims' action that he was a Rastafarian, Plaintiff filed a request with DOCCS in December of 2014 seeking a permit to grow his beard because he was a member of the Islamic faith, which was subsequently granted.  (Ex. 5 to Arnold Decl.)  In the same request for a beard permit, Plaintiff discussed his haircut, stating that "my locks on top and in the back . . . pays reverence to my *Native American heritage* that I acknowledge through my father's mother who passed away[.]  My haircut on the sides and my locks on the top and back constitutes a hairstyle, a hairstyle that is popular amongst minorit[ies] and whites of the punk rock culture." (*Id.* at p. 4-5) (emphasis added).  Finally, in a letter dated January 13, 2015, addressed to the "Inspector General," Plaintiff complained that "I was ordered to cut my locks because my hair is shaved on the sides, which represent[s] my *Native American heritage*, even though I'm registered

---

[4]      The decision from the Court of Claims regarding this action may be found by inputting the UID No.: 2017-044-548 at the following website: http://vertumnus.courts.state.ny.us/claims/maclaw.html

N.O.I. [Nation of Islam]."   (*Id.* at p. 7) (emphasis added).   Importantly, none of these communications reference Annunaki or that Plaintiff must maintain a Mohawk hairstyle because he is an Annunaki priest; rather, these communications assert that Plaintiff is attempting to adhere to other religious beliefs and/or his Native American heritage.

Based upon the foregoing, it is respectfully submitted that, at a minimum, a genuine dispute of material fact exists regarding the sincerity of Plaintiff's religious beliefs due to his inconsistent actions and testimony.   Accordingly, Plaintiff's summary judgment motion with respect to his free exercise claim must be denied.   *See Fox v. Lee*, No. 15-CV-0390, 2018 WL 1211111, at *14 (N.D.N.Y. Feb. 5, 2018) ("[P]laintiff's amended complaint conflicts insofar as he indicates he is a member of the Nation of Islam in one portion of the complaint, and of the Annunaki religion in his Motion for Summary Judgment. Such inconsistencies in plaintiff's allegations create an issue of material fact regarding the religion with which plaintiff identified that cannot be decided on summary judgment. Further, plaintiff has not established that he has a sincerely-held belief as a member of multiple religions."); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (stating that the "sincerity" prong of a free exercise analysis is almost always a question of fact).

In any event, for the reasons discussed more fully below, Plaintiff's free exercise claim should nevertheless be dismissed because (a) Plaintiff cannot establish that his religious beliefs were substantially burdened, and (b) DOCCS Directive No. 4914, which governs inmate grooming standards, serves a legitimate penological purpose.

**B.   Substantial Burden**

As stated above, if a plaintiff establishes that the religious belief in question is sincerely held, then it is the plaintiff's burden to establish that "the disputed conduct substantially burdens his sincerely held beliefs."   *Salahuddin*, at 274-75 (citing *Ford*, 352 F.3d at 591).   "A prisoner's

sincerely held religious belief is 'substantially burdened' where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 280 (N.D.N.Y. 2018) (Hurd, J.) (quoting *Jolly*, 76 F.3d at 476-77; *see also Alameen v. Coughlin,* 892 F. Supp. 440, 448 (E.D.N.Y.1995) (noting that the government's interference with plaintiff's exercise of religion must be "more than an inconvenience," and must rise to the level of "burden[ing] a belief central to plaintiff's religious doctrine.").

In *Berisha v. Farrel*, U.S. Magistrate Judge Baxter held that an inmate's religious beliefs were not substantially burdened after the inmate was stopped twice by a corrections officer, who instructed the inmate to trim his beard, and threatened to put the inmate in SHU confinement if he did not comply. *Berisha v. Farrel*, No. 9:13-CV-1191, 2016 WL 1295178, at *5 (N.D.N.Y. Mar. 8, 2016). As discussed in Point III above, Defendant did not place Plaintiff in keeplock and, although Officer Plueger warned Plaintiff to cut his hair and ultimately did place Plaintiff in keeplock when he failed to comply, Plaintiff was released after only three days when his court order was finally verified. *Id.* at *6 ("[P]laintiff's encounters with defendant qualify as the type of isolated incident, promptly corrected by the facility, that courts have typically treated as a *de minimis* burden on religious expression.").

In any event, Plaintiff was never forced to cut his Mohawk hairstyle and has continued to maintain his hairstyle while his court order remains in effect. *See Solomon v. Chin*, No. 96-CV-2619, 1998 WL 473953, at *3 (S.D.N.Y. Aug. 10, 1998) (Chin, J.) (stating that summary judgment was appropriate where "the allegations in plaintiff's complaint were merely that defendants *threatened* to cut the dreadlocks on his head upon his arrival at Downstate" but that the plaintiff had "failed to put forth any evidence suggesting that the hair on his head was actually cut") (emphasis in original); *Mack v. Griffin*, No. 04-CV-588, 2006 WL 2792736, at *7 (N.D.N.Y. Sept.

27, 2006) (granting summary judgment where "Plaintiff was not made to shave his beard. Plaintiff's only conclusory allegation is that Defendant Griffin may have stated that shaving his beard would solve Plaintiff's problem.").

## C.   Legitimate Penological Purpose

Once a prisoner has shown that the challenged practice of prison officials infringes upon his sincerely held religious belief, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny, which burden has been characterized as "relatively limited." *Hall v. Ekpe*, 408 F. App'x 385, 388 (2d Cir. 2010). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987). *Holland v. Goord*, 758 F.3d 215, 223 (2d Cir. 2014); *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). Under *Turner*, the court must determine 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). If the defendant satisfies this burden, then the plaintiff's claim must be dismissed. *See Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("Even if Defendants–Appellees substantially burdened Washington's sincerely held religious beliefs, their actions do not constitute a constitutional deprivation if they were 'reasonably related to legitimate penological interests.'").

As discussed in the declarations of DOCCS Deputy Commissioner James O'Gorman and First Deputy Superintendent Joseph Corey, the limits placed on inmate hairstyles serves legitimate penological interests such as (a) allowing corrections staff to better identify inmates, (b) preventing

inmates from smuggling contraband such as weapons or drugs, and (c) preventing inmates from using hairstyles as status symbols or identification with a gang.  (Ex. 8 to Arnold Decl., at ¶¶ 6-8 [O'Gorman Decl.]; Ex. 9 to Arnold Decl., at ¶¶ 7-9 [Corey Decl.].)  Indeed, Plaintiff has a disciplinary history involving drug possession and smuggling.  (Ex. 9 to Arnold Decl., at ¶ 14 [Corey Decl.].)  Importantly, the above-noted penological interests have been found to be legitimate by several courts throughout the Second Circuit.  *See*, *e.g.*, *Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, at *14 (N.D.N.Y. Feb. 5, 2018) (Hummel, M.J.) ("because preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner* . . . standard, defendants have set forth a legitimate penological interest.") (internal quotation marks and alterations omitted); *Shepherd v. Fisher*, No. 08-CV-9297, 2017 WL 666213, at *32 (S.D.N.Y. Feb. 16, 2017) ("The Court also finds that the Green Haven policy for conducting searches of Plaintiff's hair is reasonably related to legitimate penological objectives. Defendants have presented significant evidence that searching inmates' hair is necessary to identify and seize contraband, ensure the safety of inmates, officers, and visitors, and maintain prison security."); *accord Michel v. Manna*, 15-CV-1187, 2017 WL 1381859, at *5 (N.D.N.Y. Jan. 17, 2017) (Baxter, M.J.).  Accordingly, it is respectfully submitted that Directive No. 4914 serves a legitimate penological purpose and the enforcement of the Directive's provisions with respect to Plaintiff's hairstyle was appropriate.

## POINT V

### PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS MUST BE DISMISSED

In the Court's Decision and Order filed on October 3, 2019 (Dkt. No. 13), the Court appeared to construe the allegations in Plaintiff's original Complaint as setting forth a First Amendment retaliation claim based upon Defendant's decision to place Plaintiff in keeplock after

allegedly learning that Plaintiff had filed a previous lawsuit in *Fox v. Lee*, 9:15-CV-0390. (Dkt. No. 13 at 16 [Decision & Order filed 10/03/19] ["It thus appears that plaintiff's retaliation claim is related to his pending lawsuit, not to the merits of his religion claim."].)  After Plaintiff filed and served an Amended Complaint, the Court noted that Plaintiff's First Amendment retaliation claim had been "repeated and realleged in the Amended Complaint[.]" (Dkt. No. 19 at 4-5 [Decision & Order filed 01/24/20].)

"Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citation omitted).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citation omitted).  "An inmate bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014).  "The defendant official then bears the burden of establishing that the disciplinary action would have occurred 'even absent the retaliatory motivation,' which he may satisfy by showing that the inmate 'committed the . . . prohibited conduct charged in the misbehavior report.'" *Id.* at 226 (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 [2d Cir. 2002]).

With respect to the first element noted above (i.e., whether Plaintiff engaged in protected speech), the Court noted in its previous Decision and Order that Plaintiff's "right to bring a lawsuit

. . . is clearly constitutionally protected conduct." (Dkt. No. 13 at 16 [Decision & Order filed 10/03/19].) Defendant does not dispute that commencing a lawsuit is constitutionally protected conduct under the First Amendment. However, Defendant respectfully submits that he did not take adverse action against Plaintiff after learning about his lawsuit in *Fox v. Lee* because he did not have any involvement in placing Plaintiff in keeplock confinement. Once again, as discussed in Point III above, the keeplock log book from August 29, 2018, establishes that Officer Pflueger, and not Defendant, was the one who placed Plaintiff in keeplock confinement. (Ex. 12 to Arnold Decl.) According to Officer Plueger, Defendant did not direct him to place Plaintiff in keeplock. (Ex. 7 to Arnold Decl., at ¶ 8 [Plueger Decl.].) These assertions regarding Defendant's lack of personal involvement are consistent with those made in a separate declaration executed by Defendant on September 19, 2018, soon after the underlying events took place, which was filed in *Fox v. Lee* in response to Plaintiff's efforts to hold Defendant in contempt of Judge McAvoy's order. *Fox v. Lee*, 9:15-CV-390, Dkt. No. 203, Attach. 1 (filed 9/19/2018).

In any event, it is respectfully submitted that Plaintiff's placement in keeplock confinement for three days without suffering further deprivations does not rise to the level of an adverse action. "Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 [2d Cir. 2003]). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.'" *Lashley v. Wakefield*, 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (quoting *Gill*, 389 F.3d at 381). Importantly, however, "[p]risoners may be required to tolerate more . . . than average citizens,

before a [retaliatory] action taken against them is considered adverse." *Davis*, 320 F.3d at 353.  In this Court's Report-Recommendation, the Court grappled with the issue of whether "three days in keeplock confinement, without privileges, and without the ability to 'contact'[Plaintiff's] family constitutes adverse action, sufficient to state a retaliation claim." (Dkt. No. 13, at 17 [Decision & Order filed 10/03/19].)  The Court ultimately declined to dismiss Plaintiff's retaliation claim "[b]ecause the district courts are split on this issue, and it appears to be based, in part, on deprivations suffered[.]" (*Id.* at 18.)

Generally, "[a]n inmate on 'keeplock' is confined to his cell, room or housing unit and does not enjoy full participation in the normal prison routine." *Jackson v. Relf*, No. 9:19-CV-0193, 2020 WL 3038607, at *4 n.6 (N.D.N.Y. Jan. 6, 2020) (Dancks, M.J.).  Plaintiff described the conditions of his three-day keeplock confinement during his deposition.  Specifically, Plaintiff testified that he had the option to participate in recreation, but he refused because it required him to "stand in a cage" in the recreation yard and, before being allowed to go outside, he also had to place his boots in the food slot of his cell so they could be searched, which Plaintiff felt was degrading.[5] (Ex. 1 to Arnold Decl., at 47:8-25 [Pl.'s Dep. Tr.].)  Plaintiff also testified that he was provided meals but, because he does not consume meat, he refused the meals that were provided. (*Id.* at 48:7-16); (Dkt. No. 19, at 7 [Decision & Order filed 1/24/20 [noting that, because "Plaintiff 'does not eat meat,' he was 'left to eat bread and side dishes,' the deprivation was caused 'by his own actions [ ] rather than those of prison officials.'"].)  Finally, Plaintiff testified that there was nothing preventing him from sending mail to family members while in keeplock confinement but,

---

[5]     Plaintiff filed a grievance related to having to walk out of his cell barefoot while his shoes were searched before being allowed to attend recreation.  (Ex. B to Parmiter Decl. [AUB-74862-18].)  The IGRC response reminded Plaintiff that he has the option of wearing shower slippers while the search of his shoes is conducted.  (*Id.*)  In any event, Plaintiff conceded that Defendant was not involved with this incident and he only had to stand barefoot for "maybe a minute."  (Ex. 1 to Arnold Decl., at 49:19-22; 50:8-10 [Pl.'s Dep. Tr.].)

due to an encumbrance on his inmate account, he did not have sufficient funds for stamps.  (Ex. 1 to Arnold Decl., at 88:3-89:20 [Pl.'s Dep. Tr.].)  Accordingly, it is respectfully submitted that the conditions of Plaintiff's keeplock confinement were not abnormal or substantively atypical of ordinary conditions of keeplock confinement and, due to the *de minimis* duration of the confinement (i.e., three days), it does not rise to the level of an adverse action.  *See Hayes v. Dahkle*, No. 9:16-CV-1368, 2018 WL 7356343, at *15 (N.D.N.Y. Dec. 11, 2018) (Hummel, M.J.) (declining to find one-day of keeplock confinement rose to the level of an adverse action where "there is no indication that plaintiff suffered adverse conditions such as lack of food or denial of religious services").

Finally, it is respectfully submitted that there is no causal connection between Plaintiff's protected conduct (i.e., filing a prior federal lawsuit) and any alleged adverse action.  As discussed in Officer Pflueger's declaration (Ex. 7 to Arnold Decl., at ¶¶ 5-6) and the subsequent misbehavior report that was issued to Plaintiff (Ex. A to Plueger Decl.), Plaintiff never showed Officer Pflueger any legal document that allowed Plaintiff to have a Mohawk hairstyle.  Similarly, Defendant was unaware of Plaintiff's court order. (Ex. 6 to Arnold Decl., at ¶ 5 [Sheftic Dec.].)  *See Wrobel v. Cty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct"); *Smith v. City of Greensboro*, 647 F. App'x 976, 983 (11th Cir. 2016) ("Just as with his First Amendment retaliation claim, to prove causation, Smith must show that the decision maker was aware of the protected conduct at the time of the adverse employment action."); *Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *7 (S.D.N.Y. Mar. 16, 2020) (dismissing First Amendment retaliation claim after plaintiff failed to connect any retaliatory confinement for 72-hour period to the named defendants).

## POINT VI

### Plaintiff's Fourteenth Amendment Equal Protection Claims Must Be Dismissed

"The Equal Protection Clause protects prisoners from invidious discrimination. The provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same." *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 30 (D. Conn. 2019). To prevail on an Equal Protection claim, a plaintiff must prove that he was treated differently from other similarly situated individuals and the reason for the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 [2d Cir. 1980]).

Further, under a "class of one" theory of liability, the plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "A government official's decision 'can be considered irrational only when [the official] acts with no legitimate reason for [his or her] decision.'" *Harvey v. Mark*, 352 F. Supp. 2d 285, 290 (D. Conn. 2005) (quoting *Harlen Assocs. v. The Incorporated Vill. of Mineola*, 273 F.3d 494, 500 [2d Cir. 2001]). To support a class-of-one claim, plaintiff must allege an "extremely high degree of similarity" with the person to whom he compares himself. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.). A plaintiff is not required to prove "a defendant's subjective ill-will towards a plaintiff," and can prevail on a class-of-one claim based on similarity alone. *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019). To prevail on similarity alone, a plaintiff must prove as follows: "(i) no rational person could regard the circumstances of the

plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and differences in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu*, 927 F.3d at 94.

Here, the Amended Complaint alleges that Jewish, Muslim, Rastafarian, and Native American inmates at Auburn C.F. are "allowed to wear there [sic] religious hairstyles without keeplock or punishment." (Dkt. No. 16 at ¶ 5 [Am. Compl.].) It further alleges that "Caucasian/white" inmates are permitted to wear "there [sic] race cultural hairstyles" while Plaintiff, an African-American inmate, is "singled out for wearing African haircuts." (*Id.* at ¶¶ 7-8.) Plaintiff testified during his deposition that he believes all haircuts, except for haircuts with symbols or designs, are permitted by Directive No. 4914. (Ex. 1 to Arnold Decl., at 53:23-54:10; 55:22-56:21 [Pl.'s Dep. Tr.].) When asked to give an example of when he felt he was being singled-out, Plaintiff responded that "no one should be approached[,] not even me." (*Id.* at 60:11-19.) When asked again to provide an example of when he was singled-out, Plaintiff testified that, while he was housed at different correctional facilities, he observed Rastafarians being allowed to wear dreadlocks, Jewish inmates being allowed to wear two curls on the sides of their heads, and Norse inmates being allowed to wear ponytails with a bald head. (*Id.* at 63:19-65:2.) Plaintiff also cited Norse inmates with ponytails and "skin heads" when asked to give examples of cultural hairstyles worn by Caucasian inmates. (*Id.* at 74:4-19.)

Even assuming, however, that inmates at Auburn C.F. wore these hairstyles in 2018 (and Defendant was aware of them and did not take disciplinary action), section III(D)(2) of Directive No. 4914 expressly allows the dreadlock hairstyle so long as the dreadlocks are worn pursuant to the provisions of the Directive. This section also permits ponytails and allows hair "to grow over

24

the ears to any length desired by the inmate[,]" which would allow curls on the sides of a Jewish inmate's head.  (Ex. 9 to Arnold Decl., at ¶ 13 [Corey Decl.].)  In permitting these hairstyles under the provisions set forth in Directive 4914, DOCCS has determined that they do not interfere with the legitimate penological concerns described in Point IV.C. above that other hairstyles (such as a Mohawk) pose.  *See Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) (holding that "the unlimited right granted to Jewish and Muslim inmates, as opposed to Rastafarian prisoners, to wear religious headgear [does not] establish[ ] an equal protection violation" because of the differences in the security concerns that the type of headgear pose); *Panayoty v. Annucci*, 898 F. Supp. 2d 469, 488 (N.D.N.Y. 2012) (Treece, M.J.) (noting that, even where a plaintiff can prove that two groups are similarly situated, the different treatment could be warranted if the defendant can demonstrate that the distinctions are reasonably related to legitimate penological interests); *Vega v. Lantz*, No. 04-CV-1215, 2009 WL 3157586, at *8 (D. Conn. Sept. 25, 2009) (same).

In any event, there is no record evidence to support Plaintiff's contention that he was placed in keeplock or treated differently on account of his race or because he is an alleged member of the Annunaki religion.  Rather, the Amended Complaint alleges that Plaintiff was retaliated against for having filed a prior federal lawsuit and this is consistent with how Plaintiff described his encounter with Defendant during his deposition.  (Ex. 1 to Arnold Decl., at 39:18-44:22 [Pl.'s Dep. Tr.].)  Indeed, there is no record evidence that Plaintiff made Defendant or any other corrections officer at Auburn aware of the fact that he was an adherent of Annunaki and/or that his hairstyle was a symbol of his religion.  (Ex. 6 to Arnold Decl., at ¶ 6 [Sheftic Decl.]; Ex.  7 to Arnold Decl., at ¶ 9 [Plueger Decl.].)  This is supported by the fact that, in August 2018, Plaintiff was designated as an adherent of the Rastafarian faith, which Plaintiff changed to Santeria a few weeks later on September 11, 2018.  *See Michel v. Manna*, No. 15-CV-1187, 2017 WL 1381859, at *6 (N.D.N.Y.

25

Jan. 17, 2017) (Baxter, M.J.) ("[P]laintiff has not alleged, and the record does not show, one instance in which any of the three named defendants treated plaintiff differently than other inmates because of his Rastafarian faith, or handled any perceived violations of the Grooming Policy more favorably for other inmates *because of their religion*. Plaintiff must remember that he is suing individuals, and that the defendant must have had personal responsibility for the conduct making up plaintiff's claim.") (emphasis added); *Hamilton v. Countant*, No. 13-CV-0669, 2016 WL 881126, at *8 (S.D.N.Y. Mar. 1, 2016) (dismissing Equal Protection claim because "Plaintiff here presents no evidence that Defendant Countant exhibited a preference for any religion or displayed discriminatory animus towards any other"); *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 265 (S.D.N.Y. 2014) ("There are no facts alleged that support a claim that Plaintiffs were treated differently on account of their religion; nothing in the complaint suggests that similarly-situated inmates of other faiths were treated more favorably than Plaintiffs, or that Plaintiffs were singled out for discriminatory treatment on account of their religion."); *Barnes v. Fedele*, 760 F. Supp. 2d 296, 301-02 (W.D.N.Y. 2011) (same).

Although Plaintiff seeks to compare himself to inmate Ariel Myers, who purportedly wore a Mohawk hairstyle at Auburn (Dkt. No. 29, Attach. 1, at p. 4 [Pl.'s Ex. B]), he is not a suitable comparator. Assuming, *arguendo*, that inmate Myers did in fact have a Mohawk hairstyle, Plaintiff testified at his deposition that he has no knowledge as to whether inmate Myers wore a Mohawk hairstyle for religious purposes as opposed to a stylistic preference. (Ex. 1 to Arnold Decl., at 69:18-24 [Pl.'s Dep. Tr.].) The declaration from inmate Myers is silent on this issue as well. Accordingly, Plaintiff cannot satisfy his burden that he was treated differently on account of his religion. Furthermore, Plaintiff described his Mohawk at the time of the underlying events as being eight inches in length on the top of his head. (*Id.* at 19:9-19.) A facility picture of Plaintiff

that depicts his hairstyle is attached as Exhibit 3 to the Declaration of Assistant Attorney General Arnold. Conversely, Plaintiff described inmate Myers' hairstyle as two cornrows across the top of his head. (*Id.* at 68:4-69:10; 72:3-13.) Once again, section III(D)(2) of Directive No. 4914 permits the cornrow hairstyle. A facility picture of inmate Myers is also attached as Exhibit 3 to AAG Arnold's Declaration. Perhaps most importantly, Officer Plueger, who issued Plaintiff a misbehavior report on August 29, 2018, for his Mohawk hairstyle, also recently issued inmate Myers a misbehavior report for having a shaved head with a top-knot hairstyle on the top of his head. (Ex. B to Plueger Decl.) As such, Plaintiff cannot claim that inmate Myers received favorable treatment as compared to him since both he and inmate Myers were disciplined for their hairstyles.

Based on the foregoing, it is respectfully submitted that Plaintiff's Equal Protection claim must be dismissed because he cannot establish that Defendant harbored discriminatory animus or treated Plaintiff differently on account of his religion and/or race. Although Rastafarian, Jewish, and/or Norse inmates may be allowed to wear different hairstyles in accordance with their respective religions and/or cultures, these hairstyles, as discussed above, are permitted by Directive 4914 while designer hairstyles, such as a Mohawk, are prohibited for legitimate penological reasons.

## POINT VII

### DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the Court "looks to whether

(1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel. Duncan v. White Plains School Dist.*, No. 11-CV-6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013). The court must ask whether the right at issue was established "in a particularized sense so that the contours of the right [were] clear to a reasonable official" in light of the specific context of the case, "not as a broad general proposition." *Id.* A case directly on point is not required, and the question is not whether an attorney would learn about the right from researching case law, but whether existing precedent has "placed the statutory or constitutional question beyond debate." *Id.*

It is respectfully submitted that Plaintiff does not have a clearly established right to wear a Mohawk hairstyle as an adherent of the Annunaki religion because neither the Second Circuit nor the Supreme Court has addressed this issue. As such, a reasonable prison official would not have understood that refusing to allow Plaintiff to wear a Mohawk hairstyle, which is prohibited by Directive No. 4914, was unlawful. *See Allah v. DePaolo*, No. 17-CV-6313, 2019 WL 1367608, at *8 (S.D.N.Y. Mar. 25, 2019) ("Until the Second Circuit or the Supreme Court addresses the question of whether an NGE member [has] a First Amendment right to certain religious headcoverings, the right is not clearly established and, consequently, a reasonable prison official would not have understood that his conduct—refusing to allow Plaintiff to wear a crown—was unlawful."), *vacated in part on reconsideration on other grounds by* 2019 WL 1649021 (S.D.N.Y. Apr. 4, 2019); *accord Boyd v. Arnone*, 48 F. Supp. 3d 210, 220-21 (D. Conn. 2014). Although Plaintiff has a court order signed by U.S. District Court Judge Thomas J. McAvoy that permits him to maintain his Mohawk hairstyle, this does not clearly establish the right for purposes of qualified immunity. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004); *see also Allah*, 2019 WL

28

1367608, at *8 (noting that a settlement agreement approved and signed by the U.S. District Court does not clearly establish federal law for qualified immunity purposes).

In any event, it is respectfully submitted that Defendant and/or Officer Plueger's actions were objectively reasonable under the circumstances.  More specifically, even if a plaintiff's right is well-established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991).  Objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Id.*  Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).  A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of prison officials "are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 397.  In addition, "[w]hen officials follow an established prison policy, as defendants did here, their entitlement to qualified immunity depends on 'whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting' the directive." *Barnes v. Furman*, 629 F. App'x 52, 57 (2d Cir. 2015).

As discussed in Point IV.C. above, and throughout this Memorandum of Law, Directive 4914 serves a legitimate penological purpose.  Both the misbehavior report issued by Officer Plueger, as well as Officer Plueger's declaration, establish that Officer Plueger acted pursuant to

Directive 4914 when he ordered Plaintiff to bring his hair into compliance with the Directive.  *See Michel v. Manna*, 15-CV-1187, 2017 WL 1381859, at *5 (N.D.N.Y. Jan. 17, 2017) (Baxter, M.J.) (noting that "Plaintiff has also failed to allege that any of the defendants had the authority to ignore the plain language of [Directive 4914]").  According to Officer Plueger, Plaintiff failed to produce the court order signed by Judge McAvoy on both occasions that Plueger approached him.  (Ex. 7 to Arnold Decl., at ¶¶ 5-6 [Plueger Decl.].)  Plueger also took the initiative to investigate whether Plaintiff did in fact have a court order by conducting his own research into the matter, which did not produce anything that supported Plaintiff's claim.  (*Id.* at ¶ 5; Ex. A to Plueger Decl.) Defendant was also unaware of Plaintiff's court order in August of 2018.  (Ex. 6 to Arnold Decl., at ¶ 5 [Sheftic Decl.].)  The reasonableness of Officer Plueger's actions and/or Defendant's actions (as alleged in the Amended Complaint) is further evidenced by the numerous misbehavior reports Plaintiff has received for his Mohawk hairstyle by other corrections officials at various facilities across New York State.  (Ex. 2 to Arnold Decl., at p. 6-18.)  For all of the foregoing reasons, it is respectfully submitted that Defendant and/or any other corrections staff who were involved in this incident, such as Officer Plueger, are entitled to qualified immunity. *See Michel*, 2017 WL 1381859, at *5 ("[I]t was objectively reasonable for all of the defendants to believe that they were not violating plaintiff's First Amendment rights when they found him in violation of the Grooming Policy's prohibition on designs or patterns in inmates' hair.").

## <u>CONCLUSION</u>

WHEREFORE, for all of the foregoing reasons, Defendant respectfully requests that Plaintiff's motion for summary judgment be denied and the Court enter judgment in Defendant's favor pursuant to Fed. R. Civ. P. 56 and dismiss the Amended Complaint (Dkt. No. 16) in its entirety and as a matter of law.

Dated:  August 17, 2020
        Syracuse, New York

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant

/s / *William E. Arnold, IV*

By:  William E. Arnold, IV
     Assistant Attorney General
     Bar Roll No. 519178
     300 So. State St., Suite 300
     Syracuse, New York 13202
     Telephone: (315) 448-4821


TO:   Javell Fox, DIN No. 12-B-1626
      Great Meadow Correctional Facility
      11739 State Route 22
      P.O. Box 51
      Comstock, New York 12821-0051